Martinez-Davalos v. Merrick Garland You can't hear me. We can't hear you. You're on mute, Ms. Green. Can you hear me now? Okay. Okay. Thank you. Please, the Court, I'm Susan Green. I represent the Attorney General. Your Honors, there is no mystery as to why the immigration judge came up with a different decision in 2014 than in 2012 because the immigration judge specifically said why. And there are two parts to his answer. The first one is that in his decision in 2012, the immigration judge admitted that he had not consulted the relevant part of the regulation on C.A.T. There is a specific part of the C.A.T. definition of torture that's in the regulation that talks about what you have to have to have mental torture. And I will say that that regulation corresponds with the Senate understanding at the time that C.A.T. was ratified because it was a subject of concern for the Senate that they wanted a specific definition of mental torture because they didn't want the torture to be so broad that it was a dragnet that catches everything. And so the mental torture is defined as having two requirements. First, it has to be a prolonged mental suffering. And then second, it has to result from four kinds of activity by the torturer. And the one that is relevant here is imminent threat of death. And the immigration judge said the evidence here, once you look at the regulation, doesn't support either of those prongs. There was not prolonged imposition of mental suffering. The incidents were short. Mr. Martinez's own testimony said after the second one where they asked him to work for him, he said he went on his way. He said, I didn't think much of it. And then he ran into them a third time. And all of those times, they always said they never made a specific threat. They didn't say what was happening. I thought the second time one of the police or whatever they were used a knife. Yes, he said that they took a knife and that they put it against his stomach. But they never said, so they said, you should come work for us because they have guns. What does that mean? You put a knife in somebody's gut? It seems a pretty clear signal that, you know, you better cooperate or you've got problems. Listen to the rest of what happened, though. They didn't say, do what we say right now. They said, you should work for us. He said, I already have a job. They said, think about it. And he testified. He was asked, was that a threat? He said, no, it's not a threat. It's like, oh, come work for us. And then later he was asked, what did you think was going to happen? And he said, well, I didn't figure they were, he said, I felt a little safe because I knew they weren't going to kill me because they wanted me to work for them. And then he also said that he knew in his own mind that if it came down to it and they required him to work for them, that he could just drive to the border and turn himself in. So it's his own testimony that he did not think he was at imminent risk of death. How about the third time with the gun? I mean, again, they said, think about it. They said they gave him more time. They did not do anything that suggested that he had to make a decision then. They said, think about it. And he testified that think about it, Matt, come work for us. He didn't ever testify that he thought it was an imminent threat of death. So under the substantial evidence standard, the immigration judge certainly could say that that wasn't a prolonged torture or prolonged mental suffering with an imminent threat of death. He never said that he thought he was an imminent threat of death. So certainly under the substantial evidence standard, the evidence certainly supports the immigration judge's explanation. And the immigration judge said another thing in the 2014 hearing is that a reason to come out with a different answer in 2014 than in 2012 is in the interval, the man, Mr. Martinez, had been removed to Mexico and was there for seven months. He never saw those men again. He never encountered those men again. And so, I mean, that's very strong evidence that he could relocate and avoid them because he did relocate and avoid them. He didn't go back to Mexicali. He never saw those guys again. And he also testified that, well, what would happen if he left? He said that they'd look for him for a couple of weeks and then, like, you know, move on or forget about it. That's his own testimony. So, you know, the evidence, the immigration judge certainly had substantial evidence to think that it was possible for him to relocate and avoid those men because it happened. And as far as the other things that he said that he was afraid of in 2013, it was a completely different set of factors with no connection to the men in Mexicali. But in that case, again, he was never threatened. Nobody ever said that they were going to kill him. The worst thing that happened to him is that he was with his friend watching movies and his friend showed him a very disturbing movie. But the friend never said, you know, I'm going to kill you or I'm going to do this to you. And they remained polite. You know, Mr. Martinez said, oh, you know, he, like, he gave a polite response. So, yeah, that's, you know, that's what they do to snitches, whatever. I mean, he, they, nothing was ever explicit a threat. It's all very, very ambiguous. And when things are ambiguous, it's the trier of fact that's supposed to decide what it shows. And in this case, the trier of fact said, wow, that was really a veiled threat. Or if it was a threat at all, it doesn't seem, you know, it's very, very ambiguous. And then after they watched the scary movies, then Mr. Martinez asked Mr. Roma to take him home. Now, if he had thought he was in an imminent threat of death, he sure as heck would not have gotten in the car with his aide in Romo and asked him to take him to his house. So Mr. Romo had every chance in the world to hurt him if he had meant to hurt him. And he never did one thing to him. He never said a mean thing even, you know. So the immigration judge certainly had plenty of evidence to think that, or to conclude that nothing bad happened to him in 2013. And that was pretty good evidence that he could relocate and avoid danger. Now, I sort of think I've said, I've hit the high points. And if the court doesn't have any further questions. Could I ask you a question about our remand in 2016? Yes. So in our remand, we noted, or the panel there noted, that there was stronger support for Martinez's application. I mean, yeah, that was like, they said that there was stronger support, but that wasn't like, I mean, that certainly was not a holding. They couldn't have done, I mean, they're not the finder of fact. They asked me to address it. They must have, the panel there must have reviewed the testimony at the first proceeding and the testimony at the remand after there was the stipulated remand. They didn't find, if they had found that, I mean, if that panel had thought that this could only come out one way, they wouldn't have remanded it to the immigration judge. They remanded it to the immigration judge to explain why he made that different finding in 2014. And he said, well, the evidence in 2013 isn't stronger. It doesn't, you know, much of the evidence in 2013 weighs against Mr. Martinez having a clear probability of torture. So, yeah, I mean, the court asked him to address that evidence, and he certainly did so, and he said that he thought that it didn't enhance Mr. Martinez's claim. Can I ask you a, I'm sorry, Judge Pius. Can I ask you a somewhat unrelated question? The petitioner, the record indicates that the petitioner became an informant for the California Department of Justice, the DEA, and the ATF. Why do you want to kick him out, so to speak? Your Honor, it is certainly not, I mean, he was put in removal proceedings because he had convictions, and the removal proceeding is predicated on a conviction for assault with a deadly weapon against his girlfriend. That has nothing to do with any of the things that he was informing with ATF on. So just because he informed with ATF doesn't immunize him from removal for these other violent crimes that he committed and was convicted of. Does that answer the question? Well, does the Attorney General still have discretion? I mean, the Attorney General always has discretion, but first of all, if you're asking me why they exercised discretion to remove him after that assault with a deadly weapon, I wasn't privy to that. I don't know that that's not in the record, and it's also, you know, it's not in the record for the court either. That's discretion that was exercised, you know, within the government, and it's not part of the record. I understand that, but you could consider it now, or the Attorney General could consider it now as to whether or not he deserves, you know, the exercise of discretion. Your Honor, it's true that the government can always reconsider, and, you know, if someone in the government does reconsider, that's fine, but I don't want to tie their hands because this man has serious convictions for violent crimes, and I am not going to say that the government has changed its mind or that there's anything new. I mean, this has already been going on for 10 years, Your Honor, well, since 2012, and I think that there's been plenty of time for the government to look at it. The question is whether anyone asked, and I wouldn't expect necessarily the government to just look at it and say, oh, we're going to exercise discretion, but the question is, I'm asking, and is it something that you could consider now? Your Honor, the government can always consider it, but I am not going to represent that we consider it appropriate to stretch out this case longer than it's already been stretched out. If Mr. Martinez, as attorney, wants to ask for that, she can always ask for it, but I don't want to suggest that somebody that has all these violent crimes that, you know, after 10 years of litigating this case, that anything has changed that would change the government's mind. I mean, Ms. Murrow can always approach the government, but I don't want to represent what the result would be. Well, I agree with you that 10 years is a long time, but I don't think it's high up in the record for the length of time that immigration was done. Well, I would have to agree with that in terms of record. I mean, that can go on for a very long time, but I don't want to suggest to Your Honor that I have the ability to make this case go away because, you know, there are some serious spackers that weigh against exercise of discretion. I'm not saying one way or the other. Well, there is also the possibility of mediation. You don't have to agree or not agree to anything. Well, it's true, Your Honor. Obviously, I understand that you're already limited to arguing for an affirmance, but— Your Honor, I mean, the case has been pending for a very long time, and it could have gone in mediation for as many years before, so I don't want to commit to anything that would stretch this case out even further. And if there are any—are there any further questions? I see I'm seriously over my time, and I apologize. Well, I simply ask the Court to deny the petition for review. Thank you. Ms. Murrow, you have some time for rebuttal. Yes, Your Honor. The government pointed out that the immigration judge explained why he had made a departure from his first decision, but it just does not make sense. He had properly found that Mr. Martinez had suffered past torture, and because he continuously finds that there no longer is past torture, no public official, no acquiescence, then we can't really get into a review of whether or not there is a likelihood of future torture because in those regulations, evidence of past torture is relevant, and evidence of gross, flagrant, or mass violations are also relevant. As far as evidence that he could relocate to another part of the country, it's relevant, but this Court has never found that relocation has to be impossible. In other words, you know, that hasn't been the findings of this Court. And so because the analysis has been inappropriate, because this Court had specifically instructed the immigration judge to answer its questions as to why the immigration judge denied relief after having been presented with stronger evidence corroborating his claims regarding past torture, regarding public officials and acquiescence, to explain why he denied it. We submit that the Court still has not done that. The BIA has rubber-stamped the BIA's decision repeatedly, and so we request a remand, and in that remand, I believe that we should make some findings regarding the immigration judge's first decision. There should be some kind of perhaps res judicata principles regarding those first findings, at least regarding past torture, and then remand it to a different immigration judge at this time. I want to understand. Are you saying that the BIA was obligated to say that the IJ was lying when he explained the reasons and why he had reached his first conclusion and why that first conclusion is wrong? And you seem to be suggesting that, you know, the fact that he reached his first conclusion is the end of the case. Is the BIA supposed to say we don't believe the IJ or we, in effect, accept? They could say that they accept his explanation. And that's correct, but there should be an adequate explanation so that there could be an appropriate review of what exactly was accepted. And so when we get to that 2019 BIA decision, there's a couple of different findings that are made. For example, because the immigration judge, you know, twice, you know, first finds that there are public officials and two times finds that the BIA can't make any determination as to whether or not there was officials acting in an official capacity, and so we're just not able to make an appropriate cap finding. So at that point, it should have at least remanded it back to the immigration judge to make some significant explanations as to why he continues to make those decisions. I think that's... Why can't they just assume that they were officials? They did assume that they were officials. My question is, why can't they do that? Why can't the board assume that they were officials? Well, they did. For purposes of this decision, they did assume they were officials, but then they don't have to get into any analysis about tapia madrigal, about acquiescence, about public officials acting in an official capacity. So that analysis is taken away because the board can't make that decision. I think that would be independent fact finding if they found that they were acting in an official capacity because the judge doesn't find that in the second and third decisions. Okay. But didn't they assume? I thought that was the point. The board assumed that. So if you assume it, you don't have to analyze it. You win, so to speak, on that issue, but then the board concludes that you don't win ultimately. But I'm having trouble following why you think it would be important to have the board analyze something that they already assumed in your favor. Well, because for a convention against torture, you have to find that they're public officials and that they're acting in an official capacity. But the board assumed they were, right? Well, they place in the footnote that they can't assume that they were acting in an official capacity because the judge doesn't find that. I lost my cheat sheet because there's so many decisions, but that's in the certified administrative record. Page five through nine. Are you talking about footnote three of the most recent BIA decision? Yes. Because we will assume that they were judicial police. We conclude pursuant to Madrigal that the men were public officials. Right, correct. But then if you continue to read, they can't make the proper Madrigal analysis. So they do conclude that they're police officers, but there's no analysis as to whether or not. Whether or not they're acting in their official capacity. Right, and that's that last sentence. However, because the IJ did not make findings of fact regarding whether they were acting in an official capacity, we express no opinion. But nothing in the BIA, it wasn't like the BIA said they weren't acting in their official capacity and anything in the BIA's decision turned on that. The BIA assumed all of these things in your favor. Right, but if there's... I'm sorry, I'm sorry. Right, but for a convention against torture, they have to be acting in an official capacity. So I think if they can't make that finding, there can't be a proper CAT analysis. You can have a proper CAT analysis because you can assume that they were. I think, you know, the BIA is not saying that it didn't, it says assumed. I think the BIA is saying we're not going to find on it, we're just going to assume it. You're taking the fact that they assumed something in your favor as, well, you got to remand it. You see why that's an odd thing to say. Well, they assumed something in my favor, you need to remand it for them to decide it in my favor. Well, if they assumed it, they effectively decided it in your favor as far as their analysis went. Right, I mean, yes. I agree that they found that they were police officers. It's just my understanding that the regulations for CAT are pretty instructive as to whether or not they were acting in a public official capacity. And so I'm not sure that that sentence means that they were able to make that determination. So you're saying it's possible that they assumed, the board assumed that they were public officials. The particular incidents in play, they may have been acting outside of that capacity. Is that what you're saying? I mean, it's hard to tell because I'm not sure what it means to say that they cannot express an opinion as to whether or not they were acting in an official capacity. Sort of like they just exceeded their authority. Right, correct. Okay, anything, I think we've given you some additional time or so. I think we need to end this. Sure, thank you very much. Thank you, counsel. Counsel, we appreciate both your arguments this morning. At this time, the matter will be submitted. Thank you.
judges: Paez, Korman, Vandyke